ILLINOIS STEEL CO. v. KILMER MANUF'G CO. et al.

(Circuit Court, S. D. New York. December 9, 1895.)

PATENTS—CONSTRUCTION OF CLAIMS—INFRINGEMENT—ROLLING-MILL PLANTS.

The Garrett patent, No. 289,524, for improvements in rolling-mill plants, designed to produce a plant for working blooms and billets and reducing them to wires and rods at a single heat, and reeling them as delivered from the rolls, is strictly confined, by the prior state of the art and by the express limitations of the specification, to a direct feed from one pass of the billet train into a pair of rolls, and a direct line of feed from said pair of rolls to the rod train, both being in a direct line and in the same direction of feed, and the patent is not infringed by a mill built according to the Kilmer patent, No. 440,863.

This was a suit in equity by the Illinois Steel Company against the Kilmer Manufacturing Company and others for alleged infringement of certain patents relating to rolling mills.

John R. Bennett, for complainant.

Edward Wetmore and W. H. Singleton, for defendant.

TOWNSEND, District Judge. This is a final hearing on a bill alleging infringement of patents No. 289,524, dated December 4, 1883, and No. 319,694, dated June 9, 1885, granted to W. Garrett, assignor to complainant, for improvements in rolling-mill plants. The object of the invention of the first patent "is to produce an improved plant for working blooms and billets and reducing them to wires or rods at a single heat, and reeling them as delivered from the rolls." The patentee admits that what he proposed to do had been previously done, but "not with practical and commercial success."

The claims as to which infringement is alleged are as follows:

"(1) A rolling-mill plant for rolling wire rods directly from blooms, having in combination a billet train, B, a rod train, C, C', and an intermediate train, D, the rolls of which latter are arranged in, or approximately in, line with the last pair of delivery rolls of the billet train and the first pair or receiving rolls of the rod train, substantially as set forth.

"(2) The three trains B, D, and C, C', relatively arranged, substantially as set forth, whereby the space is left for the working of the bloom back and forth through the rolls of the train, B, except the last one, and from this

one directly to the rolls of train, D, and thence to the first pair of rolls of train, C, C', substantially as set forth.

"(3) The roll train, D, arranged with its rolls in, or approximately in, line with the last or delivery rolls of train, B, and the first or receiving rolls of train, C, C', in combination with said rolls, B, and C, C', and with the trough, b, or other suitable means, as described, whereby provision is made for turning the bar or billet intermediate between said trains, B and D, substantially as set forth.

"(4) A plant for heating the ordinary blooms of commerce, and rolling and reducing them to rods at a single heat, and reeling the rods so produced, consisting of one or more furnaces, A, billet train, B, intermediate train, D, rod train, C, C', and one or more reels, R, R, relatively arranged substantially as set forth."

The defenses are lack of patentable novelty and noninfringement.

The alleged invention relates to the machines and processes employed in wire-rod rolling mills. In these mills, by means of a series of rolls, masses of wire, known as "blooms," are successively drawn or reduced to billets, or small bars, wire rods, and wire. At the date of the alleged invention of the earlier patent in suit, there were three types of such mills, known, respectively, as the "Belgian," the "Continuous System," and the "Semicontinuous System." Each of these systems used trains of rolls revolving at a constantly increasing rate of speed, constituting a billet train for the reduction of billets to rods, and a rod train for the reduction of rods to wire. In the Belgian mill, the rolls of the billet train and of the rod train, respectively, are arranged side by side, and one train is off at one side of the other train. The billets in the Belgian mill were generally first passed back and forth through the rolls of the billet train, and then, being converted into rods, were carried in loops through the rolls of the rod train. In the continuous system, a series of rolls was so arranged that the bites of the several rolls were all in the same line, and the entire system was continuous, and was run with a constantly increasing reduction, so that the metal entering the first roll as a billet passed at a single heat out of the last rolls in a rod of the desired size. The semicontinuous

mill was made up of a combination of some of the features of each of the other systems. Numerous patents, especially No. 227,737, granted May 13, 1880, to H. B. Comer, and practical rolling mill plants, show constructions embodying in various forms the general features of the alleged invention of the patents in suit, including the blend of speed of the various rolls, the direct feed, and the feed by looping in the rod train. It is unnecessary to consider them in detail. The prior state of the art is such as to deprive Garrett of all foundation for any claim as a primary inventor. The utmost that it would be permissible to concede to him would be a claim for useful improvements in the line of the existing art, whereby the capacity of such mills was extended to larger blooms, and the output was increased.

The complainant claims that Garrett was not only the first inventor of a system whereby a larger billet than had before been used was reduced to a rod, but that by means of a pair of intermediate rolls, arranged in a certain way and having a certain rate of reduction, he avoided the danger of buckling of the wire, dispensed with the services of an extra man, and provided for the rolling of several billets at the same time. I am unable to find in the patent any statement or claim, on the part of the patentee, that he was the inventor of this so-called blending of speed, or that thereby he accomplished these results. This graduated reduction or blending of speed is an inevitable feature in the construction of every rolling-mill plant. It appears from the file wrapper that the patentee originally filed an application for an entire mill, which was rejected. In this rejection he acquiesced. Some months later, having abandoned the broad invention, he filed the specifications of the patent in suit, in which he practically limited himself to a particular method of uniting the billet and rod train. Mr. George H. Christy, attorney for Garrett, wrote a letter to the commissioner of patents, pointing out the differences between the Garrett device and that of the English patent which had been cited as a reference, in which he says that the English patent does not propose to do the work which applicant proposes; that applicant starts with a bloom, makes a billet by the use of the billet train, B; works it into a rod form by an intermediate train of rolls, D, and adds:

"And through the facility which he thus secures of going from B to C (the rod train), and, in doing so, of working the billet into a rod, he is enabled to accomplish the end in view without reheating. The train, D, is practically a bridge between B and C, and between the billet form and the rod form. * * * The success of the invention depends upon the presence of the intermediate rolls, D, in line, or approximately in line, with the last pass of the billet rolls, B, and the first pass of the rod rolls, C. The rolls D, thus arranged, bring B and C into a new and co-operative combination, and for the first time in the history of the art, render it practicable to work a four-inch bloom into a No. 4 rod without reheating."

Counsel for complainant claims that the Garrett invention consisted in a combination of the billet and rod trains, by means of one or more direct feeds between two or more pairs of rolls; it not being essential that they should follow each other, and it being immaterial where they were located, provided they were far enough apart to carry the rods and pass them from one pair of rolls to the other.

Whether the patentee did or did not originate this idea, and whether, if he did, it involved invention, is immaterial.    It is clear, from the file wrapper and the patent itself, that he explicitly limited himself to a direct feed from one pass of the billet train into a pair of rolls, and a direct line of feed from said pair of rolls to the rod train, both being in a direct line and in the same direction of feed, whereby he obtained certain advantages, in speed and location, which increased the output of the plant.   In his original application, Garrett said it made no difference how many rolls there were in either the billet, intermediate, or rod train, but in the final specification, when he found it necessary to get rid of the prior art, he limited himself to one pair of rolls in the intermediate train, and specifically stated that he did not limit himself as to the number of pairs of rolls in the billet or rod trains.   As to the necessity of the location of the pairs of rolls in a line with each other, there is much dispute. The patentee constantly refers to their location as "in, or approximately in, a common line of feed."   He explains the meaning of this description, or expression, however, in the specifications, where, referring to the drawing, which shows the three pairs of rolls arranged in a direct line, he says:

"The delivery pair of rolls, n³, of the rolls, B, and the single pair of rolls, m, of the train, D, it is observed, are in, or approximately in, a common line of feed, so that the trough or conductor, b, may guide or conduct the bar directly from one to the other."

That the "common line of feed" means directly from one to the other, in a straight line, further appears from the statement of the inventor in the specification as to the preferred form of his device. The complainant says that the preferred form is inoperative.   It is clear that it was old, or did not involve invention, and that it does not embody the blend of speed claimed to be covered by the patent. In this preferred and usual construction, the patentee so arranged the distance between the last pass of the billet train and the intermediate train that the bar might be taken out of the billet train by the workman and turned upon its edge and fed into the intermediate train.   But, in order thus to perform this function of a mere feed train, the intermediate train must be in a straight line with both the other trains.

It is unnecessary to consider the second patent.   Mr. Brevoort, complainant's expert, practically admitted that whatever of novelty or invention is claimed therein is found in the first patent in suit, and he was not called upon rebuttal to contradict defendant's contentions in regard to said second patent.

The mill of the defendant corporation was built under patent No. 440,863, granted to Irving A. Kilmer, November 18, 1890.   The grant of this later patent for a machine designed to accomplish the same result as that of the patents in suit raises the presumption that there is a substantial difference between them, and that the later is not an infringement of the earlier patents.   American Nicholson Pavement Co. v. City of Elizabeth, 4 Fish. Pat. Cas. 189, Fed. Cas. No. 312; Boyd v. Hay-Tool Co., 158 U. S. 260, 15 Sup. Ct. 837; Ney v. Manufacturing Co., 16 C. C. A. 293, 69 Fed. 405.   It is stipulated that its construction and operation are as follows:

"The defendant the Kilmer Manufacturing Company employs a rod mill, consisting of suitable furnaces, a billet train of three high rolls running at about 90 revolutions per minute, through which the billet is passed end to end six times. The bar is then square in cross section, and fed by a repeater into a bar of two high rolls of increased diameter running at the same speed, from which it emerges oval in cross section, is given a quarter turn, and passes into a trough, through which it passes without alteration, in approximately a straight line, to a pair of two high rolls in a side train, from which the rod emerges square in cross section. At this point, as each new end emerges, a catcher cuts off the imperfect end of the bar or rod, and introduces the cut end into a second pair of two high rolls in the side train. The two pairs of rolls in the side train run at about 128 revolutions per minute. From this last pair of rolls of the side train, after a quarter turn of the bar has been had, a practically straight guide conducts it in approximately a straight line to the first pair of five pairs of two high rolls, constituting a section of the rod train, running at about 320 revolutions per minute, and from the first of the next succeeding pairs, changing from square to oval cross section at each pass. From the last pair of rolls of the first section of the rod train the rod passes to the first pair of four pairs of two high rolls, constituting the final section of the rod train, running about 520 revolutions per minute, and from thence through the succeeding pairs, changing from square to oval at each pass, and from the last pair of rolls to the reels, where it is put into coil form. Repeaters are used in the two sections of the rod train where the rod emerges square in cross section. The billets operated upon range from two to four inches square, weigh 100 to 125 pounds each, and are reduced to rods of from two to five gauge at a single heat. The gauge used does not vary from the American standard wire gauge more than one-quarter size. A repeater was employed, as stated in the testimony of Mr. Irving A. Kilmer, for a short period on the square side of the side train, but was discontinued, as set forth in said testimony. The process is continuous, in the sense that no stoppage takes place which renders reheating necessary, the rod being continually in motion. The number of rods in the mill is usually one, but sometimes two."

In this construction, the two trains of rolls are not in a direct or common line of feed. The lines of feed are in opposite directions. There must be a reversal of the metal, from the common line of feed of the last pair of rolls or pass of the billet train and the first pair of rolls or pass of the side train to the common line of feed of the second pair of rolls or pass of the side train and the first pair of rolls or pass of the rod train. Nor does the side train of the Kilmer mill act either as a bridge or a feed for the passage of the bar between the billet train and rod train, as in complainant's patent. I conclude that there is no infringement.

It was contended that these differences in construction and operation were immaterial, and that defendant's devices were the equivalents of those of complainant. But a consideration of the state of the prior art, the file wrapper of the patent in suit, and the explicit language of the patent itself show that it was old to so combine two trains that a billet could be passed through at a single heating; that there was no novelty in delivering rods after certain passes into a trough, and carrying it for a considerable distance, and turning it into the next train; that there was no novelty either in a direct feed to avoid buckling, or in the avoidance of a long loop by a trough, or in blending of speeds, or in multiple rollers; and that there was no claim in the patent of any novelty in reducing a four-inch billet at a single heat. They show, further, that the patentee, in his effort to get rid of the prior art, limited himself to the precise method of unit-

ing the two parts of the train, illustrated, described, and claimed by him. If, therefore, this combination of details of improved construction, in view of its utility, may be the subject of a valid patent, yet in no event can it be given such a broad construction as to embrace the plant of the defendant.

Let a decree be entered dismissing the bill.